The first argued case this morning is No. 181310, Samsung Electronics Co., Ltd. v. UUSI, LLC. Mr. Modi. Good morning, Your Honors. May it please the Court. To convince the Patent Office to re-examine the 183 patent at issue here, UUSI admitted that it would have been obvious to arrive at the claim feature at issue here based on the teachings of Garfiede. But when Samsung presented Garfiede for the same claim feature using the same reasoning as UUSI, UUSI did an about-face and now argues that it would not even look at Garfiede. The Board not only ignored the clear admission by UUSI, it legally erred in its obviousness analysis with respect to motivation to combine and reasonable expectations. Counsel, the Board found differences between multi- and single-point devices and it said the considerations described in the patent, Ingraham and Caldwell, are wholly absent from Garfiede and they went through a substantial analysis. And so this has been gone through an original examiner and a board of three administrative patent judges and they credited testimony of one person over another. Why should we be reversing? Let me explain why, Judge Lowry. I think there are a number of reasons. If we could start with the motivation to combine and I think we can go right to the issue of why would a forerunner's skill would look at the teachings of Garfiede, which allegedly is a reference that only teaches single-point systems. So if we can start there, we believe the Board legally erred by misapplying this court standard on analogous art. As this court has made clear multiple times that prior art is analogous if the art is from the same field of endeavor. And if we look at the evidence here, starting with the 183 patent at issue, we can look at the claims, we can look at the specification, we can look at the drawings, we can look at the evidence collectively here we believe shows that the field of endeavor was capacitive, touch-responsive systems. And then UUSI represented the same to the patent office there. UUSI during the re-exam, Judge Lowry, that you referred to at A1430. Frankly, as far as I'm concerned, I wouldn't waste my time in the non-analogous art issue. Of course, it's analogous. They both relate to capacitive touch systems. But the Board noted that the art, I quote, evinces a long-standing distinction between single-point and multi-point capacitive touch-response systems. So they are analogous, but that doesn't mean combining them. It was motivation to combine them. Your Honor, I think if you look at the underlying evidence that the Board looked at, there was only one statement in Rimpolsky that the Court relied upon, which was a 1981 patent. And here we're talking about the relevant time frame is 1996, which was the filing date of the 183 patent issue. And I think the Board error, Judge Lowry, if you go back, and I think what it's telling here is if you look at the re-examination, we have yet to hear from UUSI a response on the merits with respect to the arguments they themselves made regarding Garfiede during re-examination. If you could look at A1446 of the appendix, there UUSI itself said, and I quote, Garfiede discloses selectively providing signal output frequencies. Not only did they say that, they also said it would have been obvious, and this is again at A1446. Judge Dyke, let me know when you're there. I'm there. So if you look at A1446, they also said it would have been obvious to one of ordinary skill and the art at the time of the invention to determine the single RF signal of buoy, which was a evaluating the extent of interference at a given signal frequency and selecting a different frequency when a substantial interference is detected as taught by Garfiede. That is precisely the same rationale that Samsung relied upon before the Board in the IPR. I wonder if there's a claim construction issue here that underlies some of the differences between the parties and underlies the Board decision, which in some respects, it seems to me the Board is saying that you have to have a different frequency for each key, and that that's not shown in the prior art, and I'm not sure that that construction of the claim is correct. Certainly, the patentees experts seem to say that that's what the patent required, but if I'm right, that the Board seemed to agree with that implicit construction, is that a problem here? Yes, Your Honor, I think that would be a problem here. One, we don't believe that construction would be supported by the claims or the specification here, as Your Honor is aware. In fact, the 183 patent issue, if you look at the 183 patent issue, it doesn't actually, from our perspective, teach you how you would select a row and provide a different frequency to each row. But at a minimum, I think that would require a vacature and remand, Judge Dike, if that's how you read the Board's decision. And we think here, going back to that point, if you look at, again, the underlying evidence, you know, starting with our expert, Dr. Subramanian, certainly the Board did in its final decision at one point said his testimony was conclusory as to a certain point. But do you read the Board's decision as resting on that claim construction of a different frequency for each row? Judge Dike, I believe if you look at it from that perspective, we think that's certainly one way to look at it. But we disagree, of course, with that reasoning, as we've explained in our briefs. And we think at a minimum, a vacature would be required in that instance, because the claims here clearly are much broader. They require the microcontroller to selectively provide signal at output frequencies to the terminals of the keypad. And again, if you go back to Dr. Subramanian's testimony, I think it's telling here. Samsung's expert, Dr. Subramanian, offered reasons, which actually the Board at institution stage, and this is at 8-2-64, the Board said Samsung had set forth detailed motivations to combine the cited references. Well, all of a sudden at the final decision state, that testimony became conclusory, according to the Board. We think the Board was applying, misapplied this court's case law in doing so. But going back to the testimony at issue, if you actually look at the underlying testimony that was presented by Samsung here, we think there are multiple reasons why we win. First, if you look at that underlying testimony, Dr. Subramanian clearly explained, and this is at, it's in the record at 8-5-6-4 to 5-6-6, where Samsung's expert, actually, sorry, it's 8-5-6-5 to 8-5-6-8. Samsung's expert goes through very methodically explaining why it would have been obvious to combine the teachings of Verify-D, namely the electrical interference negation, into a system that's Ingram and Caldwell. Now, what do we have from their expert in rebuttal? Their expert does not come back and say, well, it was not known to have an issue of electrical interference. Their expert never said that. He never rebutted Dr. Subramanian's testimony with respect to the point that one of skill would have had the skill level to actually implement such functionality in the Ingram-Caldwell combination. So we have no rebuttal to such testimony, and we think that's telling. The testimony that the board did rely upon, we believe, is legally irrelevant. For example, the board looked at, when it was looking at the motivation to combine, it kept on going back to the problem solved by the 183 patent. As this court's aware, just because one problem is solved by the 183 patent, that's certainly not dispositive. The prior art needs to be looked at for everything that it teaches. And here, they themselves admitted, during reexamination, for the same reasons that Samsung advanced, that it would have been obvious to combine graphite, even if you say it's a single point system, with the multiple point system of buoy, which was a reference that was at issue in reexamination. And what's more here is the board not only erred with respect to the analogous art issue, which Judge Lori, you seem to agree with us, that certainly this is analogous art. The board drew this artificial distinction that you refer to, this whole multi-point and single point system. But like I said, again, the prior art is available for everything it teaches, not just specific points. And then, with respect to the motivation to combine, the board also erred by combining motivation to combine and predictability. And as this court has time and again indicated, that's legal error for the fact finder to be to combine and predictability. The question isn't just whether it would have been obvious to go from the single point touchpad to the multiple, but how it was done using the oscillator and the various steps. And this is a harder issue to overcome, is it not? Certainly, Your Honor, that going from a single point system to a multi-point system, there are all these considerations that are taken into account. But I think if you look at the underlying evidence here, again, if we can look at it, for example, if you look at A-565, the testimony of Samsung's expert, he clearly goes through, explains step-by-step why one-of-ordinary-scale would have combined the teachings of Garfiede with the Ingram-Caldwell combination. He goes on to explain, well, Garfiede tells you how you negate this electrical interference problem, and then he explains that this would have been within the skill set of one-of-ordinary-scale in the art to implement such functionality based on the teachings of Garfiede. And again, we don't have any rebuttal evidence from the other side, from their expert, where he came in and said, okay, yes, it was not known that this electrical interference problem would have existed in the Ingram-Caldwell system. But what he does, it's 3788 there, the patentee's expert says, well, it wouldn't have achieved the invention because prior art doesn't say anything about using multiple frequencies to differentiate between neighboring touchpads, which, again, seems to me, had to have within it an implicit claim construction that that's what the invention requires, that's what the claims require. So, Your Honor, two responses to that. One is exactly what you said. They're obviously reading more in the claims than what's actually stated in the claims, and we think at a minimum, this court should make an agreement for that, for the board to determine the correct claim construction. And in fact, they try to raise this issue during the institution phase. And they're right, aren't they, that in terms, at least in terms of reasonable expectation of shown in the prior art, right? Certainly, Your Honor, if you go to that level, we don't think the evidence goes to that level in terms of, but we don't think that's required by the claims. Again, if you look at their specification and the intrinsic evidence, nowhere do they actually disclose talking, you know, they talk about dynamically changing the frequencies of the different rows. Nowhere is that disclosed in the 183 patent, and we think it would be legal error, and therefore, this court, at least on that point, should vacate and remand. But the second point here, Judge Dyke, in terms of the testimony that you're referring to, again, one of the issues, as you all know, that we have with respect to the reasonable expectation of success is that the board legally erred by requiring physical incorporation. And that's exactly what the expert is doing here in paragraph 118 on 83788. I believe that's what you were referring to, Judge Dyke. And as this court is aware, that is a physical incorporation problem. I think what he's saying is that the prior art didn't teach you to have different frequencies for different keys, which is true. But the question is, do the claims require that? Right. And again, our position, Judge Dyke, is that it's not required. And if I could just point the court to the physical incorporation requirement where we believe the board did error, if you look at 823 to 824, this is in the board's decision. We think the board could not have been clearer that they did have a physical incorporation requirement. This is what the board said. It said, neither petitioner nor Dr. Subramanian explains how this statement reasonably indicates graphitis interference algorithm, which functions in the context of having all electrodes tied together to form a single electrode and calculates drift in position across the electrode, would function successfully in the multi-touch keypad based on increment call volume. And we think that was legal error with respect to reasonable expectation of success. Let's hear from you, U.S.I. We'll save you a lot of time. Thank you, Judge Lieberman. Mr. Hadley. Good morning. May it please the court. In this case... So, isn't the board's decision here rests on an implicit claim construction, which your expert suggested that you had to have different frequencies for different keys. And if that is the claim construction, then there's a problem, at least with reasonable expectation of success, because the prior art doesn't show that. But maybe that's not the correct claim construction. Not exactly. The implicit claim construction was raised at the institution stage and carried over. The claim construction that petitioners argued was that different frequencies needed to be selectively provided to the array. What the board said, which I think is correct, is that yes, the claim language is selectively provide signal output frequencies to an array of multi-touch... Yeah, but what does that mean? Does that mean that you have to have different frequencies for different keys, or just that you have to select among frequencies to find the most effective frequency under GERF-ID for every key? And if it's the latter, then GERF-ID does seem to disclose that, but if it's the former, it doesn't. It's the latter. And GERF-ID does disclose selectively providing signal output frequencies, but it does it for a different purpose and a much different way than what is claimed in the way... Well, what difference does it make in terms of motivation to combine that it's for a different purpose? Because if the purpose is to avoid that... It makes a difference because the way that GERP-ID or GERF-ID selectively provides the signal output frequencies is that it monitors the frequencies as the single pad is operating and measures electrical interference. And when it finds a certain level of electrical interference, it performs an algorithm and then adjusts the frequencies on the back end. And what it essentially does is, because there are multiple rows within the single touch pad, is that it ties them all together to create a single electrode. Now, 1A3 patent deals with selectively providing frequencies in a completely different way for a completely different purpose. Different frequencies for different keys? What it does is... No, no, answer. Does it require different frequencies for different keys? No, it says that different frequencies have to be available for different keys. There are dependent claims. One of the dependent claims says that... I'm not sure what the difference is between what I just said and what you just said. Because... It sounds to me, okay, different frequencies available for different keys, that's not taught in the prior art. Therefore, there's no reasonable expectation of success. Correct, correct. That rests on a claim construction, which it seems to me may not be correct. The claim construction was correct. And what the claim construction said, and dependent claims supported this, was that as long as you have different frequencies available from which the microprocessor can select to give to the array to reduce crosstalk and prevent unintended actuation, that's what the claims require. And there are, in fact, dependent claims, one of which says that the microprocessor selects different frequencies for each row, and another dependent claim says that the microprocessor selects the same frequency for each row. So both are encompassed within the claim construction. But the reason why it matters in terms of looking at GERPIDE is because if you take GERPIDE's back-end procedure for determining which frequency of many to provide to which rows, the undisputed testimony is that it does not work in the 183 patent where you have multiple touchpad devices. Now, what the petitioner argued is that, well, you don't have to worry about this selectively providing, and it was legal effort to consider the whole back-end procedure versus the 183 patent's front-end procedure, because we're going to rely on CODWELL for the selectively providing. So in other words, we're going to take this sentence, we're going to parse it out, we're going to say CODWELL teaches selectively providing, and all we're using GERPIDE for is to teach frequencies, and so you don't have to consider how GERPIDE does it, and you don't have to consider what GERPIDE does it for, and you don't have to consider the difference between multi-pad and single-pad in GERPIDE versus CODWELL, because in GERPIDE we're just looking at frequencies, and CODWELL gives us everything else. But that's wrong, because CODWELL doesn't teach selectively providing. What CODWELL teaches is that you have a single frequency. It depends what you mean by selectively providing. What I mean by selectively providing is that you select the appropriate frequency for the array. Now, it can be, and you have to have multiple frequencies available. The only art... For different keys. Correct. The only art... Maybe that's not the right claim construction. I disagree. I think that it is the right claim construction, because as long as you can select among multiple frequencies, that is all that the claim language requires, and that's what the board said. So you can select the same frequency for the array, or you can select different frequencies for each row, as long as you have never has more than one frequency available. Instead, what CODWELL does is it sequentially runs the single frequency through each row one at a time. Right. That's not selectively providing. And the question is whether that is selectively providing, which is a claim construction issue. I agree that that is potentially a claim construction issue, but that selectively providing claim construction issue was never raised by either party. And what the board said, when the board describes CODWELL, and this is appendix, I believe, page 13 to 14, what the board said is that CODWELL sequentially runs each frequency through each individual row. That can't be selectively providing frequencies, plural. Maybe it can, but I mean, that's the question, whether that's what the claim requires or not. That is what the claim requires, but that's not what CODWELL does, because it can't. There aren't frequencies to select from. It can only sequentially multiple frequencies, right? No, CODWELL only has one frequency. And it says, Providing shows selecting, providing sequentially multiple frequencies, right? The only thing that CODWELL arguably does is select one row at a time, and it does so sequentially. So CODWELL cannot, GARFIDI shows providing multiple frequencies sequentially. So you choose which one is the best one for solving the interference problem. No, GARFIDI does not teach selectively providing sequentially. What GARFIDI teaches is selecting the appropriate frequency to nullify electrical interference. So there's never any, there's never, The question is whether that's what the claim is satisfied with. The claim language requires selectively providing frequencies, but if you're going to look at whether it would work when you combine GARFIDI with CODWELL, you have to consider how GARFIDI does it because of the selectively providing requirement. And there's no evidence, in fact, the only evidence in the record is that if you take how GARFIDI does it, the back-end procedure, that will not work in the combination with CODWELL and INGRAM-1, the kitchen appliance keyboard, because that is an array, and when you take GARFIDI and use the back-end procedure to tie the electrodes together, the only evidence in the record, and this is a factual finding that board made, which without some evidence can't be revisited on appeal, the only evidence that the board found as a factual matter was that when you consider how GARFIDI selects frequencies through the back-end procedure, that will not work in the combination. That is undisputed, and for that reason alone, this panel should affirm. But I'm looking to see where the method of selectively providing is somehow specified in the broadest claims. Claim 40, every independent claim uses the phrase selectively providing signal output frequencies. Yes, it uses the term, but as you've been instructed. Correct, it's specific to the particular, it's specific to those claims, but it's still a requirement. So in other words, in the prior art, if this combination, this three-way combination is going to work, there has to be some way of selectively providing frequencies as opposed to what was already in CADWELL, which is sequentially running the same I admit, GARFIDI teaches that. GARFIDI teaches selectively providing frequencies, but it does so by a back-end algorithm procedure that everybody agrees won't work in the combination. So therefore, there would have been no... That is if you want to have different frequencies for different keys. You need to have that available. You need to have the ability to is through the back-end algorithm and monitoring and then frequency adjustment for a single pad. And again, the only evidence is that GARFIDI, that GARFIDI procedure will not work in the combination. And therefore, a person of ordinary skill in the art would not have been motivated to make the combination. That's essentially what the board found is a factual matter. And the board said, look, there is substantial evidence to support the fact that a person of skill in the art would not have been motivated to make this combination and expected it to work because GIRPI deals with single pads. The other two deal with multiple pads. GIRPI uses a back-end algorithm and monitoring procedure that won't work with the other two. That was the board's factual finding. And there was more than substantial evidence to support it. And no argument that the petitioner makes about legal error, it was proper under Deere versus... I'm sorry, under Graham versus John Deere to consider the scope and content of the prior art and the differences between that art and the claimed invention. And those differences include how GIRPI calculates and determines which frequency to apply to each row. And again, the board found that doesn't work in this combination. Therefore, there has to have been substantial evidence to support the board's position. Any questions for Mr. Hatch? I have three minutes, but unless the panel has further questions for me... Actually, just quickly, if I could briefly raise this admission issue. One of the ways that they tried to get around the fact that GIRPI won't work in the combination said, well, we admitted that it would. But that admission, again, was that GIRPI teaches selectively providing the frequencies. And we said that raises a question of patentability, and it did. But if you're going to hold that as an admission, even though we think it was WAVE, you have to take the admission as a whole, including not just the frequency part of GIRPI, but the selectively providing the frequency part of GIRPI, including the procedure to do it, which doesn't work in the combination. GIRPI does vary the oscillator frequency. And isn't that the key now to this multi system? The key isn't just varying the oscillator frequency. It's varying the oscillator frequency using the GIRPI procedure of back-end monitoring. Which doesn't get you different frequencies for different keys, is your argument. Oh, no, it does. It can't. My argument is that it can't. I admit that it can. It's just that it won't work in the combination. Because when you try to put that... You admit that it provides... GIRPI provides different frequencies for different keys? GIRPI can provide different frequencies. Well, in the context of a single pad, it can, because it ties all the rows together to form a single electrode. And that's why GIRPI does provide different... Actually, it doesn't provide different frequencies. I apologize, Your Honor. I misspoke. It provides one frequency for, I think, 32 cycles, and then it can change that frequency through further monitoring. It doesn't provide different frequencies for different keys? Not at the same time. But regardless, the point is that it can vary the oscillator frequency, but the way it does it, again, won't work in the combination. And so if you take the re-examination, that was exactly what happened in the re-examination. We said this raises a patentability, but when you try to combine GIRPI with the other art, it won't work. And therefore, the invention is not obvious. Was not obvious. Was not obvious. Correct. Was not obvious. Now I'm down to 20 seconds, and unless there are more questions, I'll give up the rest of my time. Okay. I think we have the argument. Thank you, Mr. Hadley. Mr. Modi? Your Honor, just a few points. I think one of the problems that we've had throughout the proceeding below and even here today is that the patent owner, UUSI, keeps on injecting limitations into the claims that are not present in the claim. Going back to the claim construction issue, that you raised, if you look at claim 45, so if you look at A69, which has claim 45, one of the challenge claims at issue here, it actually says that you can provide the same frequency to all of the rows, which shows that the board's narrow claim construction would be incorrect here. And the claim is broad enough to encompass the same frequency being provided to the different rows. And given their admissions in the re-exam, we think when you look at Dr. Subramanian's testimony again, which is unrebutted on the electrical interference point that Ingram Caldwell would have had that issue, when you couple that with their re-examination again, I have not heard on the merits of the statement. They just didn't say that the Graffiti system selectively provides signal output frequencies. They said more than that. They said it would have been obvious to one of ordinary skill in the art to modify a system, a multipoint system, in that case it was Bowie, to implement the teachings of Graffiti. And when you say something is obvious, it would have been obvious those were their statements. They said more than they perhaps needed to, but they have to live with those admissions. When they said it would have been obvious, that obviously encompasses both motivation to combine and reasonable expectation of success. And in terms of the measuring aspect, if you look at A3330, we have additional testimony from Dr. Subramanian, Samsung's expert, who explained how one of ordinary skill would have combined Graffiti with the teachings of Ingram and Caldwell. With respect to the 183 patent, again, today, again, and throughout their briefing and before the board, they keep on going back to the problem solved by the 183 patent. In terms of what the board looks at or what this court looks at from an obviousness perspective, obviously it's not limited to the problem solved by the 183 patent. Finally, on the Caldwell issue, I heard them say that, well, Caldwell doesn't teach selectively providing, but if you look at the record below and it's at A13214, the board certainly did not address that issue. It certainly had no issue with the Ingram-Caldwell combination selectively providing a frequency, and that's where Graffiti came in, where it teaches providing multiple frequencies and provides the motivation why you would change, go from a single frequency to multiple frequencies. Unless you have any other questions, that's all I have. Thank you. Thank you both for cases taken under submission.